AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
### for the
Middle District of Pennsylvania

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br><br>One Rose Gold Apple iPhone | )<br>)<br>)  Case No. 1:26-MC-  00154<br>)<br>)<br>) |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-2.

located in the _____Middle_____ District of _____Pennsylvania_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 21 U.S.C. § 846 | Conspiracy to distribute a controlled substance |

The application is based on these facts:

I, Evan G. McMahon, a Special Agent with the United States Drug Enforcement Administration (the "DEA"), being duly sworn, depose and state:

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days *(give exact ending date if more than 30 days* _____ *) is requested under* 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Evan G. McMahon, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____Telephone_____ *(specify reliable electronic means)*.

Date: **FEBRUARY 27, 2026**

_____
*Judge's signature*

City and state:  Harrisburg, Pennsylvania

Daryl F. Bloom, Chief U.S. Magistrate Judge
*Printed name and title*

## CONTINUATION PAGES FOR AFFIDAVIT IN SUPPORT OF SEARCH WARRANT APPLICATION

### INTRODUCTION AND AGENT BACKGROUND

1.     I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of cellular phones described in Attachments A-1 and A-2, currently in law enforcement possession, and the extraction from those devices of electronically stored information described in Attachment B

2.     I am an "investigative or law enforcement officer of the United States" within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516. I have been employed by the Drug Enforcement Administration ("DEA") as a Special Agent since March 2024. I attended the DEA academy in Quantico, Virginia from March 2024 through July 2024. During my period at the academy, I was trained and tested on the roles and responsibilities of a Special Agent and the investigation of federal drug crimes, including drug identification, criminal law and courtroom procedure, surveillance, evidence handling,

search warrant procedure, report writing, training in surveillance, counter-surveillance, and the smuggling of drugs.

3.      I am currently assigned to the Harrisburg Resident Office. Prior to my employment with the DEA, I served as an Engineer with the Department of Defense. I have participated in numerous investigations involving the unlawful distribution of controlled substances and have participated in surveillance, the execution of search warrants, the recovery of substantial quantities of narcotics and narcotics paraphernalia, and the debriefings of informants and cooperating witnesses. I have reviewed recorded conversations, as well as documents and other records, relating to narcotics trafficking. Through my training, education, and experience, I have become familiar with how illegal drugs are transported, stored, and distributed, how firearms are possessed and used in connection with drug trafficking, and the methods by which drug traffickers store and conceal the proceeds of their illegal activities. I have served as a monitor, served as a member of a surveillance team, and have listened to intercepted telephone calls between individuals identified as suspected narcotics traffickers.

4.      Based on my training and experience, I am familiar with how drug traffickers and gang members communicate and operate. For example, I am aware that drug traffickers and gang members frequently discuss criminal activity using cellular telephones and often use coded language to obscure these conversations. I also know that drug traffickers and gang members change phones to evade detection by law enforcement. Moreover, I know that drug traffickers and gang members obtain phones from third parties and or subscribe to them in fictitious names to mask the true identity of the individuals using the phones. I am familiar with the typical make up and operation of gangs and drug trafficking organizations, including the distribution, storage, and transportation of the drugs, the collection of money, which represents the proceeds of drug trafficking and other criminal activity, and money laundering.

5.      This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all my knowledge about this matter.

6.    I make this affidavit, in part, based on personal knowledge derived from my participation in this investigation and, in part, based upon information from oral and written reports about this investigation prepared by me or other law enforcement officers and debriefings conducted by me or other law enforcement officers of confidential sources regarding Luis Daniel Ortiz-Santiago ("Ortiz-Santiago"), and other known and unknown co-conspirators.

7.    Except where otherwise noted, the information set forth in this affidavit has been provided to me directly or indirectly by other Special Agents/Task Force Officers of the DEA or other law enforcement officers.  Unless otherwise noted, wherever in this affidavit I assert that a statement was made, the information was provided by another law enforcement officer (who may have had either direct or hearsay knowledge of the statement) to whom I have spoken or whose report I have read and reviewed.    Similarly, information resulting from surveillance, except where indicated, does not set forth my personal observations but rather has been provided directly or indirectly by other law enforcement officers who conducted such surveillance.

IDENTIFICATION OF THE DEVICES TO BE EXAMINED

8.    The property to be searched consists of a cracked Blue Apple iPhone ("TARGET DEVICE 1") and a Rose Gold Apple iPhone ("TARGET DEVICE 2") (collectively, the "TARGET DEVICES").

9.    The TARGET DEVICES were seized by the DEA on February 2, 2026, pursuant to a federal search warrant and the arrest of Ortiz-Santiago at 516 Jones Street, Lebanon, Pennsylvania.

10.    The TARGET DEVICES were subsequently transported to the DEA Harrisburg Resident Office located in Harrisburg, Pennsylvania, where they remain.

11.    The applied-for search warrant would authorize the forensic examination of the TARGET DEVICES for the purpose of identifying electronically stored data particularly described in Attachment B.

PROBABLE CAUSE

12.    Beginning in approximately August 2024, the DEA, in conjunction with various other law enforcement entities, has been investigating a cocaine Drug Trafficking Organization ("DTO") based in south central Pennsylvania that was obtaining kilogram quantities of cocaine from a Puerto Rico based source of supply. The investigation

identified Ortiz-Santiago as a Pennsylvania based leader of the organization, who was responsible for procuring the cocaine from Puerto Rico. Additionally, the investigation identified Ortiz-Santiago as being responsible for the subsequent redistribution of the cocaine in the Middle and Eastern Districts of Pennsylvania. Furthermore, Fernando Camacho-Morales ("Camacho-Morales") was identified as the Puerto Rico source of supply for Ortiz-Santiago.

13.    On March 28, 2025, DEA agents from the DEA Ponce Office, in Puerto Rico, assisted the Puerto Rico Police Bureau Ponce ("PRPB") Drug Unit with a search warrant for Bo Guayabal, Sect Cerro, Carr 552, Juana Diaz, Puerto Rico, the residence of Camacho-Morales. During the execution of the search warrant, PRPB officers discovered 13 baggies of suspected cocaine. Furthermore, two cellular telephones were discovered on the body of Camacho-Morales and seized by PRPB. The applicable cellular telephone numbers associated with the seized phones were (939) 249-9597 and (939) 279-7300.

14.    In September 2025, court-authorized search warrants were issued in Puerto Rico for the two cellular telephones seized from Camacho-Morales on March 28, 2025. I subsequently reviewed the data extraction from Camacho-Morales's cellular telephones and observed a WhatsApp text message from cellular telephone number (939) 249-9597 to cellular telephone number (717) 758-5003, on March 24, 2025.  The message contained an image of a United States Postal Service ("USPS") receipt. Cellular telephone number (717) 758-5003 was a cellular telephone number associated with Ortiz-Santiago. The tracking number on the receipt was 9505511411025083945662, the same tracking number related to a March 28, 2025, parcel containing cocaine that was seized by the United States Postal Inspection Service and the DEA.

15.    On January 21, 2026, a Grand Jury in the Middle District of Pennsylvania returned an indictment against three defendants, including Ortiz-Santiago and Camacho-Morales, for violating Title 21, United States Code, Section 846, conspiracy to distribute and possess with intent to distribute cocaine. Arrest warrants were also issued.

16.    On January 28, 2026, the Honorable Daryl F. Bloom, Chief United States Magistrate Judge for the Middle District of Pennsylvania, signed a search warrant authorizing the search of Ortiz-Santiago's residence at 516 Jones Street, Lebanon, Pennsylvania.

17.    On February 2, 2026, at approximately 6:00 a.m., members of the DEA Special Response Team executed the search warrant at Ortiz-Santiago's residence.    Prior to the search warrant being executed, investigators established surveillance on the residence and observed Ortiz-Santiago entering and exiting. DEA agents detained Ortiz-Santiago and Jessica Montes-De Armas until the residence was secured.

18.    Investigators conducted a search of the residence and found a red and black loaded Glock magazine with 10 9mm cartridges on a shelf in the kitchen, a loaded extended magazine with 30 9mm cartridges in a black duffle bag in the attic, TARGET DEVICE 1 located in the 2nd floor bedroom of Ortiz-Santiago and Montes-De Armas, TARGET DEVICE 2 located in the 2nd floor bedroom of Ortiz-Santiago and Montes-De Armas, an Apple iPhone with a flower case in the 2nd floor bedroom of Ortiz-Santiago and Montes-De Armas, and a quantity of United States Currency located in the 2nd floor bedroom of Ortiz-Santiago and Montes-

De Armas. Investigators also observed identifying information for Ortiz-Santiago and Montes-De Armas in the aforementioned 2nd floor bedroom.

19.    Ortiz-Santiago and Montes-De Armas were subsequently *Mirandized.* Ortiz-Santiago identified TARGET DEVICE 2 as belonging to him. Montes-De Armas identified the Apple iPhone with a flower case as belonging to her. She further provided the passcode and written consent to search that cellular telephone. Neither individual claimed TARGET DEVICE 1.

20.    Throughout the course of the investigation, I identified (717) 758-5003, (717) 758-6243, and (717) 758-4196 as cellular phone numbers associated with Ortiz-Santiago, indicating that Ortiz-Santiago has used multiple cellular telephones. Furthermore, based on the aforementioned drug-parcel postal receipts sent to cellular telephone number (717) 758-5003, I know that Ortiz-Santiago has used cellular telephones in furtherance of his drug trafficking organization.

21.    Additionally, I know through my training and experience that drug traffickers use cellular telephones to procure and distribute controlled substances. The cellular telephones of drug traffickers are used to communicate with source(s) of supply, customers, and other members of the drug trafficking organization. As a result, the cellular telephones of drug traffickers will often contain the telephone numbers of other members of the organization and text message conversations between members discussing their drug trafficking activities. Additionally, I know the cellular telephones of drug traffickers will often contain photographs of controlled substances, large sums of currency, and tracking information for parcels that contain controlled substances. As a result, I believe that the TARGET DEVICES contain information that will allow investigators to identify co-conspirators, methods of operation, and other details of Ortiz-Santiago's drug-trafficking organization.

22.    The TARGET DEVICES are currently held in custody of the
DEA, within the Middle District of Pennsylvania. And in my training and
experience, I know that the TARGET DEVICES have been stored in a
manner in which their contents are, to the extent material to this
investigation, in substantially the same state as they were when the
TARGET DEVICES first came into the possession of investigators.

## TECHNICAL TERMS

23.    Based on my training and experience, I use the following
technical terms to convey the following meanings:

   a. Wireless telephone:  A wireless telephone (or mobile
      telephone, or cellular telephone) is a handheld wireless
      device used for voice and data communication through
      radio signals.  These telephones send signals through
      networks     of     transmitter/receivers,     enabling
      communication with other wireless telephones or
      traditional "land line" telephones.  A wireless telephone
      usually contains a "call log," which records the telephone
      number, date, and time of calls made to and from the
      phone.   In addition to enabling voice communications,
      wireless telephones offer a broad range of capabilities.
      These capabilities include: storing names and phone
      numbers in electronic "address books;" sending, receiving,
      and storing text messages and e-mail; taking, sending,
      receiving, and storing still photographs and moving video;
      storing and playing back audio files; storing dates,
      appointments, and other information on personal
      calendars; and accessing and downloading information
      from the Internet.  Wireless telephones may also include
      global positioning system ("GPS") technology for
      determining the location of the device.

b. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

c. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

    d. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

24.    Based on my training, experience, and research, I know that the TARGET DEVICES have capabilities that allow them to serve as wireless telephones, digital cameras, portable media players, GPS navigation devices, and PDAs. In my training and experience, examining data stored on devices like the TARGET DEVICES can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

25.    I also know through training and experience that drug traffickers utilize wireless telephones to contact other associates (or co-conspirators) who are involved with the supply, transportation, and distribution of illicit drugs and other illegal activities. As a result, the wireless telephones of drug traffickers often contain historical records relating to their drug-trafficking activities, to include: locations they have travelled to meet co-conspirators to exchange contraband, telephone numbers of drug-trafficking associates, photographs and names of contacts who have called or have been called, records of received and sent

text messages, emails and other forms of communications, to include messaging within phone applications, and photographs/videos of money, firearms, and drugs.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

26.    Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device.   This information can sometimes be recovered with forensics tools.

27.    *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the TARGET DEVICES were used, the purpose of their use, who used them, and when.  There is probable cause to believe that this forensic electronic evidence might be on the TARGET DEVICES because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

28. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the TARGET DEVICES consistent with the requested warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire media, that might expose many parts of a device to human inspection in order to determine whether it is evidence described by the warrant.

29. *Manner of execution.* Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

30. The warrant I am applying for would also permit law enforcement to obtain from certain individuals the display of physical biometric characteristics (such as fingerprint, thumbprint, or facial characteristics) in order to unlock devices subject to search and seizure pursuant to this warrant. I seek this authority based on the following:

a. I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners and facial recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

b. If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

c. If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face. For example, Apple offers a facial recognition feature called "Face ID." During the Face ID registration process, the user holds the device in front of his or her face. The device's camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Face ID.

d. In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

e. I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when (1) more than 48 hours has elapsed since the device was last unlocked or (2) when the device has not been unlocked using a fingerprint for 4 hours *and* the passcode or password has not been entered in the last 156 hours. Biometric features from other brands carry similar restrictions. Thus, in the event the TARGET DEVICES are equipped with biometric features, the opportunity to unlock the TARGET DEVICES through a biometric feature may exist for only a short time.

f. In my training and experience, the person who is in possession of a device, claims a device, or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of the device whose physical characteristics are among those that will unlock the device via biometric features, and it is also possible that the person who claimed a device or in whose possession the device has been found is not actually a user of that device at all. Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device without any identifying information on the exterior of the device. Thus, it will likely be necessary for law enforcement to have the ability to require any individual reasonably believed by law enforcement to be a user of the TARGET DEVICES, to unlock the TARGET DEVICES using biometric features in the same manner as discussed above.

g. Due to the foregoing, if the TARGET DEVICES may be unlocked using one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to (1) press or swipe the fingers (including thumbs) of any individual, who is reasonably believed by law enforcement to be a user of the TARGET DEVICES, to the fingerprint scanner of the TARGET DEVICES; (2) hold the TARGET DEVICES in front of the face of those same individuals and activate the facial recognition feature, for the purpose of attempting to unlock the TARGET DEVICES in order to search its contents as authorized by this warrant.

19

## CONCLUSION

31.    I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the TARGET DEVICE described in Attachments A-1 and A-2 to seek the items described in Attachment B.

## ATTACHMENT A-2

### Property to be Searched

The property to be searched is a rose gold Apple iPhone ("TARGET DEVICE 2"), currently in the custody of the DEA, in Harrisburg, Pennsylvania.

This warrant authorizes the forensic examination of TARGET DEVICE 2 for the purpose of identifying electronically stored data described in Attachment B.

## ATTACHMENT B

## Particular Things to be Seized

1.      All records on TARGET DEVICE 1 and TARGET DEVICE 2, described in Attachments A-1 and A-2, respectively, that relate to violations of 21 U.S.C. § 846, since October 19, 2024, and including:

      a. lists of customers and related identifying information;

      b. types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

      c. any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

      d. any information recording Luis Daniel Ortiz-Santiago's schedule or travel;

      e. photographs and videos of firearms, drugs, and cash; and,

      f. all bank records, checks, credit card bills, account information, and other financial records.

2.      Evidence of user attribution showing who used or owned TARGET DEVICE 1 and TARGET DEVICE 2 at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

3.      As used above, the terms "records" and "information" include all the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

4.      Law enforcement personnel are authorized to (1) press or swipe the fingers (including thumbs) of any individual who is reasonably believed by law enforcement to be a user of TARGET DEVICE 1 and / or TARGET DEVICE 2, to the fingerprint scanner of the device; (2) hold TARGET DEVICE 1 and / or TARGET DEVICE 2 in front of the face those same individuals and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.

2